14 CV 1375

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
PATRICK CRAMER, suing individually and in
his capacity as Co-Administrator of the Estate of
Gérald Cramer,

                      Plaintiff,

           -against-

THE CALDER FOUNDATION a/k/a
THE ALEXANDER AND LOUISA
CALDER FOUNDATION; ALEXANDER
S.C. ROWER, in his individual capacity;
SANDRA CALDER DAVIDSON,
SHAWN DAVIDSON and
ALEXANDER S.C. ROWER, as
EXECUTORS of the Estate of Alexander Calder,
Deceased; and JOHN DOES 1-20.

                 Defendants.

-----------------------------------------------------------------X

___ Civ. _____ (___)

ECF CASE

**COMPLAINT**

(Jury Trial Demanded)

Plaintiff, Patrick Cramer suing individually and in his capacity as Co-Administrator of the Estate of Gérald Cramer, by his attorneys Eaton & Van Winkle LLP, for his complaint against defendants The Calder Foundation a/k/a The Alexander & Louisa Calder Foundation ("The Calder Foundation" or the "Foundation"); Alexander S.C. Rower ("Rower" or "Mr. Rower"); and Sandra Calder Davidson, Shawn Davidson and Alexander S.C. Rower, as Executors of the Estate of Alexander Calder (the "EAC"); alleges as follows:

### PRELIMINARY STATEMENT

1.     More than a half century after the sale of *Eight Black Leaves*, a mobile sculpture created by Alexander Calder, the Calder Foundation has effectively blocked any sale of the sculpture by alleging that it is a fragment of a larger work. *Eight Black Leaves* was directly sold by Calder to Gérald Cramer in 1948. It was sold as a fully integrated work. The recent assertion

by the Calder Foundation that it is a mere fragment of a larger work was never previously made -- not by Alexander Calder, nor by his estate, nor by the Foundation -- until Gérald Cramer's heirs indicated a desire to sell the work in 2012. The Foundation, which itself owns more than 22,000 Calder works worth hundreds of millions of dollars, has compromised its scholarly integrity by falsely labeling *Eight Black Leaves* as a fragment. This wrongful act is part of a larger pattern in which the Foundation has controlled the market for Calder works through arbitrary determinations of authenticity. The Foundation's authenticity decisions are fueled by the Foundation's conflict of interest -- and its self-interest -- as both the arbiter of authenticity and the owner of numerous Calder works worth hundreds of millions of dollars. A true and correct copy of a photograph of *Eight Black Leaves* taken in Gérald Cramer's family home in Mies, Switzerland is annexed hereto as **Exhibit A.**

2.      This is an action for damages, product disparagement, anti-trust violations and related claims against the Calder Foundation, Alexander S.C. Rower, the Foundation's Chairman and President, and the Estate of Alexander Calder for wrongfully destroying the marketability of *Eight Black Leaves* a mobile created by the artist Alexander Calder. *Eight Black Leaves* was purchased by Gérald Cramer in 1948.

3.      Calder was a prominent and acclaimed American artist best known for his sculptures and his origination of the mobile, a type of kinetic sculpture comprised of suspended components which move in response to motor power or air currents. He was born in 1898 and died in 1976. Today, 35 years after his death, the market for Calder's works is thriving. His sculptures and mobiles typically sell for several millions of dollars. In 2012, a standing mobile by Calder titled "Lily of Force" sold at Christie's for $18.5 million.

4.      Gérald Cramer was the proprietor of the Cramer Art Gallery in Geneva, Switzerland. He and Calder were friends and he purchased *Eight Black Leaves* directly from Calder in 1948.

5.      *Eight Black Leaves* was displayed at the Cramer Gallery in Geneva, Switzerland and was also the subject of a publication (Cramer Gallery Catalogue no. 6, 1950) which Gérald Cramer gave to Alexander Calder in 1950 almost immediately after its publication. A true and correct copy of page 44 of Cramer Gallery Catalogue no. 6, 1950, containing a photograph and description of *Eight Black Leaves*, is annexed hereto as **Exhibit B.**

6.      It is undisputed that Calder received a copy of Cramer Gallery Catalogue no. 6, 1950, containing a photograph and description of *Eight Black Leaves*, soon after its publication. It is also undisputed that Calder never voiced any objection to the inclusion of *Eight Black Leaves* in the Cramer Gallery Catalogue, never questioned its authenticity and never challenged Gérald Cramer's status as the rightful purchaser and owner of the piece. Calder also never asked Gérald Cramer to return the work of art.

7.      Having full knowledge of Gérald Cramer's possession and ownership of *Eight Black Leaves*, Calder maintained a lifelong friendship and friendly correspondence of approximately 40 letters and postcards with Gérald Cramer, which would have been inconceivable had Gérald Cramer wrongfully possessed and displayed *Eight Black Leaves*, the work that he purchased from Calder.

8.      The Calder Foundation is a Not-For-Profit Corporation which has been granted tax-exempt status based on a stated charitable purpose of "cataloguing all the works produced by the artist Alexander Calder and making his works available for public inspection in order to

facilitate art education and research." See, Calder Foundation 2011 Annual Filing For Charitable Organizations, Part IX A, a true and correct copy of which is annexed hereto as **Exhibit C**.

9.     For many years the Foundation operated as a *de facto* authentication committee that accepted applications for review of artworks attributed to Calder and provided inventory numbers for those works that were deemed to be authentic.  During this time, the Foundation also was involved in preparation of a catalogue raisonné, a complete catalogue of all of Calder's works.  Upon information and belief, the Foundation no longer formally authenticates Calder works and it has abandoned compilation of the Calder catalogue raisonné in order to insulate itself from accountability for its authentication decisions which are often arbitrary and self-interested.   Notwithstanding the cessation of formal authentication of Calder works, the Foundation still gives out private information at an owner's request and it still provides inventory numbers for those works deemed to be authentic.  This is a well known fact in the marketplace for Calder works, and works without an inventory number issued by the Calder Foundation cannot be sold as authentic Calder works.

10.     In 2012, Gérald Cramer's heirs decided to sell *Eight Black Leaves*.  Accordingly, they contacted Christie's, which informally agreed to sell the painting through an auction in New York City subject to the issuance of an inventory number by the Calder Foundation.

11.     Initial inquiries by Christie's in April of 2012 were followed up with correspondence and an exchange of information between Patrick Cramer (Gérald Cramer's son and a prominent art dealer in his own right) and the Calder Foundation.  The Foundation acknowledged that *Eight Black Leaves* was the work of Calder and that it was rightfully owned by Gérald Cramer. It recognized the authenticity of the piece by acknowledging that it is documented in the Foundation's records.  However, the Foundation suggested that *Eight Black*

*Leaves* was a fragment of a larger work and therefore not deserving of an inventory number. In the more than 60 years since Gérald Cramer's purchase of *Eight Black Leaves*, nobody had ever claimed or suggested that *Eight Black Leaves* was a fragment of a larger work. This unsupported assertion was only made after the Foundation learned that the Estate of Gérald Cramer sought to obtain an inventory number in order to sell the Work. Accordingly, after the Foundation suggested that *Eight Black Leaves* might be a fragment of a larger work, Patrick Cramer provided supplemental information to the Foundation which established, beyond any doubt, that *Eight Black Leaves* was an authentic and complete Calder work with its own artistic integrity—and not a fragment of a larger work.

12.    After the Foundation failed to refute or contest the evidence provided by Patrick Cramer, the attorneys for Plaintiff wrote to the Foundation requesting issuance of an inventory number. By failing to acknowledge or respond to that request, the Foundation has effectively denied the request for issuance of an inventory number and rendered *Eight Black Leaves* unmarketable.

13.    The Calder Foundation has acknowledged the authenticity of, *Eight Black Leaves*, a Calder work owned by Plaintiff. Despite an acknowledgment of authenticity, the Foundation has refused to provide an inventory number for the Work in its allegedly "official inventory" of the works of Alexander Calder. There is a clear conflict between the Foundation's self-serving protection of its own collection of Calder's works, and its protection of the private collections of Foundation officers, directors and board members, and Calder family members; and the Foundation's duty to the public to act impartially in connection with cataloguing all works by Calder. *Eight Black Leaves* is indisputably an authentic work by Alexander Calder. Its

provenance is not disputed in any way.  A contrived and unsupported denial of its rightful place

in the inventory of Alexander Calder dishonors his memory, and his body of work.

## PARTIES

14.     Plaintiff, Patrick Cramer is a resident and citizen of Geneva, Switzerland.  He is

the foremost author of catalogue raisonnés in the world (Chagall, Masson, Miro, Moore, Picasso)

and is also an art dealer and the principal of the Galerie Patrick Cramer in Geneva, Switzerland.

He is the son of the late Gérald Cramer, the founder of the Galerie Gérald Cramer, who died on

or about March 17, 1991.  He is also a Co-Administrator of the Estate of Gérald Cramer.

15.     Defendant The Calder Foundation a/k/a The Alexander & Louisa Calder

Foundation ("The Calder Foundation" or the "Foundation") is, upon information and belief, a

New York not-for-profit corporation with a place of business at 207 West 25th Street, 12th

Floor, New York, New York 10001.  Upon information and belief, the Foundation was created in

1988, and is a § 501 (c) (3) exempt private foundation under the Internal Revenue Code.  Upon

information and belief, and according to tax returns filed by the Foundation, the principal

purpose of the Foundation is "cataloguing all of the works produced by the artist Alexander

Calder and making his works available for public inspection in order to facilitate art education

and research."  See, **Exhibit C** annexed hereto (Part IX A).  (emphasis supplied).

16.     Defendant Alexander S.C. Rower ("Rower") is the Chairman and President of the

Foundation and the grandson of Alexander Calder.  Upon information and belief, Rower is a

citizen of the United States who resides in New York County, New York.

17.     Decedent Alexander Calder, who was a resident of New York, left a last will and

testament which was probated in New York County Surrogate's Court. Defendant Sandra Calder

Davidson, Shawn Davidson and Alexander S.C. Rower, as Executors of the Estate of Alexander

Calder are presently the authorized and acting executors of the Estate of Alexander Calder (the "EAC"). Upon information and belief, the Executors of the EAC exercise substantial control over the Foundation and its actions. Upon information and belief, Shawn Davidson is the Treasurer of the Foundation and Sandra Calder Davidson is the Foundation's Secretary.

18.     John Does 1-20 are past and present officers, directors and employees of the Foundation and/or relatives of Alexander Calder who have knowingly participated in, or willfully ignored, the fraudulent and manipulative acts alleged herein. Any such officers, directors, employees and/or relatives of Alexander Calder so named herein are citizens of New York State.

## JURISDICTION AND VENUE

19.     The plaintiff is a natural person who is a Swiss citizen with a permanent domicile in Geneva, Switzerland. The defendants are, respectively, a not-for-profit corporation with a principal office in the state of New York, a natural person who is a United States citizen with a permanent domicile in the state of New York and the estate of a New York decedent whose will was probated in the state of New York, County of New York. The amount in controversy exceeds $75,000, exclusive of interest and costs. This Court has jurisdiction pursuant to 28 U.S.C. § 1332.

20.     This Court also has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1367 (a) and 28 U.S.C. § 1337 (a) because plaintiff's antitrust claims arise under §§ 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2) and are brought pursuant to §§ 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26).

21.     Venue is proper in this court pursuant to 28 U.S.C. § 1391(b) (1).

## FACTS

### Alexander Calder

22.     Alexander Calder was an American artist best known for his sculptures and his origination of the mobile, a type of kinetic sculpture comprised of suspended components which move in response to motor power or air currents.

23.     Calder was born in 1898 and died in 1976. Calder created his first kinetic sculpture or mobile in the fall of 1931.

24.     During the 1930's and 1940's Calder's international acclaim as an artist grew and continued to do so throughout his lifetime. Two months after his death, in 1976, Calder was posthumously awarded the Presidential Medal of Freedom.

25.     Since his death, Calder's work has been the subject of numerous museum exhibits throughout the world. Calder's work is also featured in many permanent museum collections worldwide including the Whitney Museum of American Art, New York, which has the largest body of work by Calder in any museum; the Museum of Modern Art, New York; the Centre Georges Pompidou, Paris; the Museo Nacional Centro de Arte Reina Sofía, Madrid; the Philadelphia Museum of Art; and the National Gallery of Art, Washington, D.C.

26.     Today, 35 years after his death, the market for Calder's works is thriving. In 2010, his metal mobile *Untitled (Autumn Leaves)*, sold at Sotheby's New York for $3.7 million; later in 2010 another mobile, titled *Red Curlicue* (1973), was sold for $6.35 million; and a standing mobile titled *Lily of Force* (1945), sold at Christie's for $18.5 million in 2012.

### The Calder Foundation

27.     The Calder Foundation is a Not-For-Profit Corporation which has been granted tax-exempt status in order to fulfill its stated charitable purpose of "cataloguing all the works

produced by the artist Alexander Calder and making his works available for public inspection in order to facilitate art education and research." See, Calder Foundation 2011 Annual Filing For Charitable Organizations, Part IX A, a copy of which is annexed hereto as **Exhibit** C.

28.    The Foundation was incorporated in New York in 1988 as the Alexander and Louisa Calder Foundation, Inc. Its name was changed in 2006 to the Calder Foundation.

29.    The Foundation, which purports to be a registered Not-For-Profit Corporation, was required to file a Registration Statement with the New York State Attorney General Charities Bureau. However, a Freedom Of Information Law request made to the New York State Attorney General's office in June 2013 revealed that the Foundation's Registration Statement -- required to be filed by all Not-For-Profit corporations in the State of New York -- "could not be located" in the New York Attorney General's Office's files.

30.    Defendant Alexander S.C. Rower is, on information and belief, the President and Chairman of the Calder Foundation and in charge of its day-to-day operations. He is the grandson of Alexander Calder.

31.    Upon information and belief, Howard Rower, Sandra Calder Davidson, Andrea Davidson, Shawn Davidson, Holton Rower and Gryphon Rower-Upjohn are all trustees of the Foundation, as well as descendants of Alexander Calder by blood or marriage.

32.    According to the Calder Foundation's website, the Foundation has registered in its archive more than 22,000 works made by Calder. Owners of works attributed to Calder are encouraged to register their works in the archive and to update the Foundation with any changes to their collection.

33.    The Foundation regularly issues inventory numbers for Calder works registered with the Foundation. The art market for Calder's works considers an inventory number issued

by the Calder Foundation equivalent to a certificate of authenticity. Conversely, it is well known in the art market and the Calder sub-market that the Foundation's refusal or failure to issue an inventory number is tantamount to a determination that the work is not authentic, and that such refusal or failure renders the work essentially unmarketable.

History and Provenance of <em>Eight Black Leaves</em>

34.    This case involves the Foundation's refusal to assign an inventory number to *8 Feuilles Noires* a/k/a *Eight Black Leaves* (hereinafter referred to as *Eight Black Leaves* or "the Work") a Calder work owned by the Estate of the late Gérald Cramer.

35.    The history of Gérald Cramer's acquisition of *Eight Black Leaves* fully supports its entitlement to an inventory number. *Eight Black Leaves* was sold directly by Alexander Calder, to Gérald Cramer in 1948. It is a mobile which was exhibited by Gérald Cramer in his art gallery in Geneva, Switzerland on repeated occasions. It was also the subject of a publication (Cramer Gallery Catalogue no. 6, 1950) which Gérald Cramer gave to Alexander Calder in 1950 almost immediately after its publication. A copy of page 44 of the Cramer Gallery Catalogue no. 6, 1950, containing a photograph and description of *Eight Black Leaves*, is annexed hereto as **Exhibit B.**

36.    It is undisputed that Calder received a copy of the Cramer Gallery Catalogue no. 6, 1950, containing a photograph and description of *Eight Black Leaves*, soon after its publication. It is also undisputed that Calder never voiced any objection to the inclusion of *Eight Black Leaves* in the Cramer Gallery Catalogue, he never questioned its authenticity and he never challenged Gérald Cramer's status as the rightful purchaser and owner of the piece. Calder also never asked Gérald Cramer to return the work of art.

37.    Having full knowledge of Gérald Cramer's possession and ownership of *Eight Black Leaves*, Calder maintained a lifelong friendship and friendly correspondence of

approximately 40 letters and postcards with Gérald Cramer, which would have been inconceivable had Gérald Cramer wrongfully possessed and displayed *Eight Black Leaves*, the work that he purchased from Calder. A copy of a photograph of *Eight Black Leaves* taken in the Cramer family home in Mies, Switzerland is annexed hereto as **Exhibit A.**

38.    Despite Calder's acknowledgment of the authenticity of *Eight Black Leaves*, and the Foundation's own documentation of the work, the Calder Foundation has refused to assign an inventory number for *Eight Black Leaves*.

39.    Consistent with Calder's own acknowledgment of authenticity, the Calder Foundation has acknowledged the authenticity of the *Eight Black Leaves* as a work created by Calder and legitimately purchased from Calder by Gérald Cramer in a letter dated October 22, 2012 to Patrick Cramer. Its legitimacy is undisputed. Nevertheless, the Foundation has refused to provide an inventory number for the Work in its allegedly "official inventory" of the works of Alexander Calder.

<u>The Foundation's Refusal To Issue An Inventory Number For *Eight Black Leaves*</u>

40.    Patrick Cramer has made several requests to Mr. Rower and the Calder Foundation for assignment of an inventory number for *Eight Black Leaves*. Mr. Cramer wrote to Mr. Rower: on June 6, 2012; and July 31, 2012. Neither of these letters was ever answered. On October 5, 2012, Mr. Cramer wrote to Mr. Rower, for a third time, to request that the Calder Foundation assign an inventory number to *Eight Black Leaves*. A true and correct copy of the October 5, 2012 letter from Patrick Cramer to Alexander S.C. Rower is annexed hereto as **Exhibit D.**

41.    On October 22, 2012, Mr. Rower and the Calder Foundation responded to Mr. Cramer's request for assignment of an inventory number. This response contained many factual

inaccuracies. The response was ambiguous.  Although the letter wrongly asserted that *Eight Black Leaves* was a fragment of a larger work, it did not deny -- and therefore implicitly acknowledged -- that the Work was created by Calder and that it was purchased by Gérald Cramer, who was its rightful owner.  Mr. Rower's ambiguous response did not explicitly deny the request for an inventory number, but it did not grant the request either.  A true and correct copy of Mr. Rower's October 22, 2012 letter to Patrick Cramer is annexed hereto as **Exhibit E.**

42.     On November 26, 2012, Patrick Cramer responded to Mr. Rower's October 22, 2012 letter.  Mr. Cramer's November 26, 2012 letter enclosed a legal opinion prepared by Maître Olivier Weber-Caflisch, of Geneva, Switzerland.  The opinion was enclosed in its original French and in an English translation.  Mr. Weber-Caflisch is a renowned expert in copyright and legal art matters, who has written several books and articles on the topic.  He is also a well-known arbitrator in complex cases involving art-related disputes.  Maître Weber-Caflisch's opinion identified several factual errors in Mr. Rower's October 22, 2012 letter.  It also established that *Eight Black Leaves* is a *sui generis* work and not a disassembled element of a composite work.  Accordingly, the Calder Foundation should have granted it an inventory number which is equivalent to a certificate of authenticity.  In view of Maître Weber-Caflisch's opinion, Mr. Cramer reiterated his request for issuance of an inventory number for *Eight Black Leaves.*  A true and correct copy of the November 26, 2012 letter from Patrick Cramer to Alexander S.C. Rower with the attached legal opinion of Maître Weber-Caflisch is annexed hereto as **Exhibit F.**

43.     Mr. Rower did not respond to Patrick Cramer's letter of November 26, 2012. Accordingly, Plaintiff's counsel wrote to Mr. Rower on August 7, 2013.  Plaintiff's counsel's August 7, 2013 letter to Mr. Rower requesting assignment of an inventory number and annexing

the legal opinion of Maître Olivier Weber-Caflisch of Geneva, Switzerland, exposed the disingenuous nature of the Foundation's position as set forth in Mr. Rower's October 22, 2012 letter. A true and correct copy of the August 7, 2013 letter from Michael A. Lacher to Alexander S.C. Rower with attached legal opinion of Maître Weber-Caflisch is annexed hereto as **Exhibit G.**

44.    Mr. Rower neither disputed nor responded to the August 7, 2013 letter from Plaintiff's counsel and the Foundation has refused to address the substance of Plaintiff's request for issuance of an inventory number. Mr. Rower's refusal to respond to the August 7, 2013 letter within a reasonable time constitutes a refusal to issue an inventory number. This has rendered the Work unsalable.

45.    *Eight Black Leaves* is a piece that clearly has its own compositional integrity. (See, **Exhibits A and B** annexed hereto). The Calder Foundation's assertion that it has allegedly "documented" *Eight Black Leaves* as a "fragment of a larger work" is without any evidentiary support. It is contradicted by Calder's own knowledge and approval of Gérald Cramer's ownership, possession and display of *Eight Black Leaves* which establishes, without doubt, that Calder himself recognized *Eight Black Leaves* as a *sui generis* work. It was sold by Calder and purchased by Gérald Cramer as an independent free-standing work. There is no evidence to the contrary.

46.    The Calder Foundation's refusal to issue an inventory number for *Eight Black Leaves* is motivated by the Foundation's effort to promote the substantial assets managed and held by the Foundation, and its directors, officers and trustees, and represents a grave conflict between those interests and the charitable purpose of the Foundation as tax-exempt not-for-profit

corporation -- to catalogue, and to promote the public display of <u>all</u> of the works produced by Calder.

47.     Issuance of the requested inventory number would impact the values of the Calder Foundation's directors' and officers' private collections, as well as the value of those Calder works owned by the Foundation itself.  This conflict of interest has interfered with the Calder Foundation's execution of its responsibilities to the public as a tax-exempt charitable organization.

48.     *Eight Black Leaves* is indisputably an authentic work by Alexander Calder.  Its provenance is not disputed in any way.

<u>The Hundreds of Millions of Dollars in Calder Works Owned By The Foundation, The Estate, Rower, The Foundation's Officers and Board Members and Other Members of The Calder Family</u>

49.     The Foundation's 2011 Tax Return indicates that the Foundation's assets include works of art with an end of year book value of $223,985,948 and a Fair Market Value of $335,757,798.  <u>See</u>, **Exhibit C**.

50.     Upon information and belief all, or a vast majority, of the works of art owned by the Foundation are Calder works.

51.     Upon information and belief, Rower; the Estate of Alexander Calder; Foundation Board Members, Officers, Directors and Employees other than Rower; and Calder family members other than Rower all own substantial amounts of Calder works worth many millions of dollars.

## CAUSES OF ACTION

### COUNT ONE
**(Declaratory Judgment of Authenticity and Mandatory Injunction Against All Defendants)**

52.     Plaintiff repeats and realleges each and every allegation set forth in Paragraphs 1-51 above and incorporates the same by reference as if fully set forth herein.

53.     As a not-for-profit corporation, the Foundation and its officers and trustees have an obligation to act in good faith to further the charitable and educational purposes for which the Foundation exists.

54.     The principal charitable and educational purpose of the defendant Foundation, as set forth in its tax returns and on its website is "cataloguing all of the works produced by the artist Alexander Calder and making his works available for public inspection in order to facilitate art education and research." Calder Foundation 2011 Annual Filing For Charitable Organizations, Part IX A, a copy of which is annexed hereto as Exhibit C.  (emphasis supplied).

55.     Overwhelming and conclusive evidence establishes that *Eight Black Leaves* is an authentic work by Alexander Calder.

56.     Despite its undisputed authenticity, the Foundation has refused to assign an inventory number to *Eight Black Leaves*.

57.     Without an inventory number, *Eight Black Leaves* is not marketable and a work produced by Calder cannot be catalogued or made available to the public for art education and research in accordance with the charitable and educational purpose of the Foundation.

58.     There is no good-faith basis for the Foundation's wrongful refusal to issue an inventory number to *Eight Black Leaves*.

59.     In view of the Foundation's bad-faith refusal to issue an inventory number in accordance with its status as a not-for-profit corporation and its stated charitable and educational purposes, a mandatory injunction should be entered requiring the Foundation to issue an inventory number for *Eight Black Leaves* and the plaintiff is entitled to a declaratory judgment which holds and adjudges that *Eight Black Leaves* is an authentic work of art created by Alexander Calder.

## COUNT TWO
### (Product Disparagement Against All Defendants)

60.     Plaintiff repeats and realleges each and every allegation set forth in Paragraphs 1- 59 above and incorporates the same by reference as if fully set forth herein.

61.     The above-described actions of defendants in refusing to issue an inventory number for *Eight Black Leaves* disparages the Work and reflects negatively on its quality, condition and value.

62.     Defendants' conduct amounts to a willfully false statement, inasmuch as there is no reasonable dispute that the Work is a genuine Calder.

63.     In April of 2012, Christie's in New York contacted the Foundation, on behalf of the Plaintiff, to request issuance of an inventory number for *Eight Black Leaves*.  Christie's showed them the Work in April 2012.  If the Foundation had issued an inventory number for *Eight Black Leaves*, Christie's would agreed to sell the work at auction on behalf of the plaintiff.

64.     As of the date of this complaint, defendants have refused to issue an inventory number for the Work, which communicates to the art market in general, the sub-market for the sale of the works of Calder and to Christie's, as the auction house chosen to sell the Work on behalf of the plaintiff, the false information that the Work is not authentic.

65.     On information and belief, the actions of defendants in wrongfully refusing to issue an inventory number for the Work were motivated solely by malice, the desire and intention to obtain the Work for themselves at a price far below its true value and the desire and intention to limit the supply of authentic Calder's available on the market to increase the demand for, and value of, Calder works owned by the Foundation, Rower, EAC and John Does 1-20.

66.     Mr. Rower's October 22, 2012 letter to Patrick Cramer, responding to Mr. Cramer's October 5, 2012 request for an inventory number was ambiguous and inconclusive. Although the letter wrongly asserted that *Eight Black Leaves* was a fragment of a larger work, it did not deny -- and therefore implicitly acknowledged -- that the Work was created by Calder and that it was purchased by Gérald Cramer, who was its rightful owner.  Mr. Rower's ambiguous response did not explicitly deny the request for an inventory number, but it did not grant the request either. See, **Exhibit E.**

67.     In view of Mr. Rower's ambiguous and inconclusive October 22, 2012 response to Patrick Cramer, Mr. Cramer reiterated his request for issuance of an inventory number for *Eight Black Leaves* on November 26, 2012, at which time he also provided the Foundation with a legal opinion prepared by Maître Olivier Weber-Caflisch in order to furnish the Foundation with additional information confirming the authenticity of *Eight Black Leaves*. See, Exhibit F.  When the Foundation did not respond to Mr. Cramer's November 26, 2012 letter and the attached legal opinion, plaintiff's counsel wrote to the Foundation on August 7, 2013, explicitly requesting issuance of an inventory number for the work.   The Foundation did not respond to or acknowledge the letter from plaintiff's counsel.  The Foundation's failure to issue a timely response constitutes a de facto rejection of plaintiff's request for issuance of an inventory number. See, Exhibit G.

68.     Plaintiff has suffered special damages insofar as he has been unable to sell the Work which has been rendered unmarketable as a direct and proximate result of defendants' product disparagement.  As a result Christie's is unable to auction the Work.

69.     The Work, if authenticated, is estimated to be valued at $1,200,000 ($1.2 Million Dollars).  Defendants' product disparagement has made the work unmarketable, has caused Christie's to refuse or decline to auction the Work and has damaged plaintiff in an amount to be determined at trial but which is in no event is less than $1,200,000 (One Million Two Hundred Thousand Dollars), plus interest.

70.     Plaintiff is further entitled to punitive damages in an amount to be determined at trial because of defendants' willful and malicious actions.

## COUNT THREE
### (Violation of §§ 1 and 2 of the Sherman Act and the New York Donnelly Act Against All Defendants)

71.     Plaintiff repeats and realleges each and every allegation set forth in Paragraphs 1-70 above and incorporates the same by reference as if fully set forth herein.

72.     Defendants have violated the federal Anti-Trust Act and New York's Donnelly Act by engaging in a conspiracy to restrain and monopolize trade in the market for Calder works.

73.     For a period of over thirty-five years, since Calder's death in 1976, the Foundation and Rower have conspired, along with John Does 1-20, to control the market for Alexander Calder artwork.

**The Relevant Market**

74.     The relevant market being unlawfully dominated and unreasonably restrained by the activities of defendants and their alleged co-conspirators is the offering and sale, at auction or otherwise, of Calder artwork worldwide.

75.     The market for Calder artwork is a subset of the broader global market for modern and contemporary art, which includes approximately 500 artists including Calder, Warhol, Pollock, Picasso, Miro and Rothko.  Each of these artists comprises his own distinct submarket within the general global market for modern and contemporary art.

76.     This limitation of the relevant submarket specifically to Calder artwork finds support in the following facts, among others:

i)      Calder artwork is typically included in the category of "modern and contemporary artists" in auctions, museum showings, dealer and gallery advertising and sales literature, and newspaper and magazine articles;

ii)     Calder artwork is typically advertised for sale, whether privately or at auction by specific reference to the name Alexander Calder, rather than by generic reference to "modern and contemporary" art;

iii)    Showings and exhibitions often feature multiple Calder artworks to the exclusion of all other modern and contemporary artists;

iv)     Calder's signature kinetic mobiles or sculptures represent a unique style and form differentiating Calder from other modern and contemporary artists and making his work particularly well-suited to be classified as a submarket;

v)      Artists themselves are conscious of, and often influenced by, the style represented by specific artists, as opposed to the styles of modern and contemporary artists generally;

vi)     Prospective buyers and sellers estimate the value of Calder's works primarily by reference to other Calder works as opposed to hundreds of other artists included in the general category of modern and contemporary art; and

vii)    Calder artwork is not interchangeable with works by other modern and contemporary artists because major art purchases are motivated by highly subjective tastes, indicating a lack of cross-elasticity of demand.

77.    The value of modern and contemporary art generally, and Calder artwork specifically, regularly range into the millions of dollars or more because the supply of artwork from a given deceased artist is fixed, prospective buyers of a given work are put into a room at one time for the auction, and bidders can be numerous with substantial funds to bid.

78.    Auctions are held in various cities around the world, including New York and London, and prospective bidders from many countries are often in attendance, either in person or by proxy, to bid on a specific work of art.

79.    Although the market for artwork is distinct from the authentication process, the two are nonetheless very closely linked. This is because those who bid for or buy modern and contemporary art, whether privately or at auctions, are typically unable to ascertain by themselves the authenticity of a work that they may wish to buy. Bidders and buyers thus rely heavily on the opinion of one or more experts to guide their decisions.

80.    Institutions such as museums, galleries and auction houses routinely arrange for inspections and opinions from art experts before offering a work of art for sale. These inspections and opinions are necessary as potential buyers will not spend substantial sums of money on an artwork without assurances of its authenticity.

81.    By reasons of these opinions, vast sums of money, (often in the millions of dollars or more) are paid for works of art for which an acknowledged expert renders a convincing opinion of authenticity.

82.     The persons buying such art are, in fact, buying not just the opinion and reasoning behind it, but the credentials and expertise of the authenticating experts as well.

83.     Any unreasonable limitation on the use of qualified experts to inspect, employ their expertise, and render their reasoned opinion on the authenticity of major works of art, or any manipulation of judgments of authenticity in order to impact the supply and availability of works of art by major artists, would significantly impact the market for such works by denying valuable information that the buying and investing public depends upon when determining whether to buy, and how much to pay for a particular work of art.

84.     In the case of the Calder submarket, the Foundation is presently recognized as the primary and accepted authority for rendering authenticity decisions with respect to Calder works of art.  Its holdings of hundreds of millions of dollars worth of Calder works, has created a conflict of interest which has manifested itself in dishonest and manifestly inaccurate and incorrect determinations of authenticity which have resulted in the restraint and monopolization of trade with respect to the submarket for Calder works.

**Trade and Commerce**

85.     Defendants' acts, as alleged herein, have resulted in the restraint of interstate commerce in New York City, the United States generally, and elsewhere, and have tended to create, and actually created, a monopoly in the line of interstate commerce within such geographic areas.

86.     Plaintiff has been injured in its business and property by reason of Defendants' performance of those acts in violation of the antitrust laws.

<u>Claims Alleged—Nature and Effect of Conspiracy</u>

87.     Beginning, upon information and belief, in or about 1988, and continuing up to the date of this Complaint, the Defendants have engaged in a conspiracy and have constrained trade, monopolized and attempted to monopolize trade and commerce in the offering and sale of Calder artwork in New York, the United States generally, and the rest of the world, in violation of §§ 1 and 2 of the Sherman Act and the New York Donnelly Act (15 U.S.C. §§ 1 and 2). These violations are continuing and will continue unless the relief prayed for herein is granted.

88.     Pursuant to, and in furtherance of the aforementioned restraint of trade, actual and attempted monopolization, and conspiracy to monopolize, defendants have sought to control the submarket for Calder works by preventing various Calder works from being offered or sold, at auction or otherwise, by among other things:

     i.   Acting as a *de facto* Authentication Board for Calder's works by soliciting owners of Calder works to submit their works for evaluation, authentication and potential inclusion in a catalogue raisonné containing all of Calder's works;

     ii.   Exerting its influence over the art world and the Calder submarket -- by virtue of its presumptive credibility as a not-for-profit corporation responsible for "cataloguing all of the works produced by the artist Alexander Calder and making his works available for public inspection in order to facilitate art education and research" -- to effectively require a favorable opinion of authenticity from the Foundation before any Calder artwork can be sold;

iii.   Keeping its methods and procedures for evaluation of Calder works secret, so as to avoid scrutiny of its decision-making process and the basis (or lack of basis) for its decisions;

iv.   Purporting to change the scope of its evaluation of Calder works by claiming that it does not offer certificates of authenticity, that it is no longer compiling a catalogue raisonné and that it no longer authenticates works.  These changes were implemented after the Foundation was sued in 2007 for refusing to authenticate a Calder stage set used in a production entitled *Socrate* which was mounted in 1977, a year after Calder's death.  Calder's family members and Foundation Board Members authorized the production, served on a committee formed to raise money for the production and attended the opening of the production.  The production credited Calder with creation of the "Mobile Set" used in the production and with stage design.  Nevertheless, the Foundation refused to authenticate and refused to provide any reasons for such refusal.  The lawsuit was dismissed on technical grounds relating to pleading deficiencies and expiration of the statue of limitations.  However, the Foundation's defense was based purely on these technical grounds and it never actually denied the authenticity of the work which it had refused to authenticate;

v.   Despite trying to insulate its exposure, by changing the nomenclature of what it does, the Foundation still acts as a *de facto*

Authentication Board. Instead of "authenticating" works, it now claims to "register" Calder works. For every work that is registered the Foundation issues an inventory number. Although they no longer refer to it as authentication and their website no longer refers to a catalogue raisonné, the Foundation's influence in the Calder sub-market remains exactly the same. In the market, Calder works cannot be sold without an inventory number. The Foundation continues to exercise its influence in a manner that restrains trade, monopolizes ownership and control over the submarket for Calder works and favors the Calder works owned by the defendants (the Foundation, Rower, EAC and John Does 1-20 consisting of past and present officers, directors and employees of the Foundation and/or relatives of Alexander Calder) over those owned by "outsiders" such as the plaintiff in this action.

vi.  Upon information and belief, the Foundation also manipulates and controls the submarket for Calder works by influencing which works are displayed in museums, exhibits, galleries and special shows and favoring those works owned by the defendants and their co-conspirators thus boosting the exposure and value of their works and diminishing the value of competing Calder works owned by "outsiders."

90.  In a recently decided lawsuit, the EAC, working in concert with the Foundation, which was not formally a party to the lawsuit, filed stale and meritless claims against the Estate

of Klaus G. Perls (Calder's former art dealer).  Consistent with the Foundation's attempts to horde Calder works and to control the market, the EAC belatedly sought to assert ownership rights to several Calder works which had been consigned to the Perls Gallery and had previously been included on inventories provided to the EAC in the aftermath of Calder's death, more than thirty-five years ago.  Although the Foundation was not formally a plaintiff in this action, it was clearly the driving force behind the EAC's lawsuit.  Rower, who was appointed a successor executor of EAC in April 2012, provided affidavits on behalf of the plaintiff throughout the lawsuit.  In support of its stale claims, the EAC made scurrilous and irrelevant allegations concerning alleged financial indiscretions of Klaus Perls, Calder's former art dealer and good friend.  In dismissing the EAC's claims, with prejudice, the Court stated that "...all these allegations are so patently inadequate that the court can only conclude that they were brought solely for the purpose of harassment or embarrassment, without any consideration of their legal sufficiency." The inappropriate allegations made by the EAC in the Perls litigation are of a piece with the Foundation's frivolous and self-interested refusal to provide an inventory number for *Eight Black Leaves* in the instant case.  A true and correct copy of the December 23, 2013, Decision and Order in <u>Sandra Calder Davidson et al. v. Katherine Perls et al.</u>, annexed hereto as **Exhibit H**.

91.     In the <u>Calder Davidson v. Perls</u> action, the EAC also sued Douglas Mayhew, a former employee of the Perls Gallery, alleging that Mayhew and Roberto Callabero (the "Mayhew parties") were improperly exercising possessory rights over Calder works of art and correspondence rightfully owned by the Calder Estate.  Unable to fund a litigation defense, the Mayhew parties agreed to a settlement of the lawsuit in April of 2011.  In the settlement, the Mayhew parties agreed to surrender to the EAC certain items in their possession including four

specified Calder works, and all documents in their possession, custody and control regarding those works. In return for the Mayhew parties' surrender of certain items, the EAC agreed to promote the marketability of the Mayhew parties' remaining Calder works stating that "[t]he Estate shall use [its] best efforts to ensure that the Calder Foundation...provide[s] application numbers [inventory numbers] for genuine works of art created by [Calder] which [the Mayhew parties] may in the future submit to obtain application numbers from the Calder Foundation for inclusion in the [Calder] Catalogue Raisonné."

92.     In connection with the settlement between the EAC and the Mayhew parties, the Foundation provided the Mayhew parties with a letter, signed by Rower, stating in relevant part:

> The Calder Foundation is aware that a settlement has been reached between (a) Sandra Calder Davidson, Mary Calder Rower and Shawn Davidson, as Executors of the Estate of Alexander Calder, Deceased (the "Estate") and (b) Douglas Mayhew and Roberto Caballero and is aware of the Settlement Agreement between said parties dated as of April 13, 2011 (the "Settlement Agreement"), including paragraph six thereof. The Calder Foundation shall in good faith cooperate with the Estate's obligation under paragraph six of the Settlement Agreement and shall provide application numbers, consistent with its usual and regular business practices, for genuine works of art created by AC which DM and/or RC may in the future submit to the Calder Foundation...

A true and correct copy of the April 13, 2011 letter from Alexander S.C. Rower, as authorized signatory for the Calder Foundation to Douglas Mayhew and Roberto Caballero is annexed hereto as **Exhibit I.**

93.     The Foundation reneged on its obligation to provide application numbers (inventory numbers) to works submitted by the Mayhew parties, consistent with its stated usual and regular business practices. Likewise, the EAC reneged on its obligation, pursuant to the settlement reached between the parties, to "...use its best efforts to ensure that the Calder Foundation...provide[s] application numbers [inventory numbers] for genuine works of art created by [Calder] which [the Mayhew parties] may in the future submit to obtain application

numbers from the Calder Foundation for inclusion in the [Calder] Catalogue Raisonné." Instead, the Foundation refused to honor its obligations under the settlement agreement alleging that the settlement had been fraudulently induced and that forty-nine illustrative sketches submitted by the Mayhew parties were "correspondence" rather than works of art which should have been provided to the EAC pursuant to the settlement agreement. The EAC and Rower also claimed that the EAC had not breached the settlement agreement because the "'usual and regular business practice' [of the Calder Foundation] is that it will not review a work of art other than for the rightful owner of that work [and] that [i]t will not cooperate with any party who wrongfully possesses [a Calder] work of art, or any entity that does not have legal title to such works." The EAC's (and the Foundation's) refusal to honor their obligations under the settlement with the Mayhew parties was unwarranted and without basis. Accordingly, the Mayhew parties were forced to expend their resources to bring a motion to compel the EAC to comply with the terms of the settlement agreement. The Court rejected all of the EAC's arguments and granted the Mayhew parties motion to compel the EAC to comply with the settlement agreement and to use its best efforts to ensure that the Calder Foundation issues inventory numbers in accordance with paragraph 6 of the settlement agreement. In finding that the Calder Foundation had failed to comply with the terms of the settlement agreement, the Court held, among other things, that (1) the forty-nine illustrative sketches are works of art, rather than "correspondence" as asserted by the EAC, and (2) the EAC relinquished any purported rights to assert ownership over the works owned by the Mayhew parties when it settled the matter and (3) the EAC's remaining claims were discontinued, with prejudice. A true and correct copy of the April 19, 2012 Decision and Order in Sandra Calder Davidson et al. v. Katherine Perls et al., annexed hereto as **Exhibit J**.

94.     This bad faith effort, by the EAC and the Foundation, to renege on its settlement obligations in an attempt to gain possession of Calder works that they were not entitled to is part of their larger scheme to wrongfully control and manipulate the market for Calder works. The Foundation is the owner of Calder works valued at hundreds of millions of dollars and it is the only entity able to issue an inventory number, which is needed in order to sell a Calder work. This conflict of interest -- as owner and authenticator -- has resulted in abusive practices by the Foundation in order to favor its own works, and those of Calder family members.

95.     The foregoing combination of conspiracy and violations has had the effect of eliminating certain unfavored works from the Calder submarket on an arbitrary basis rendering such works devoid of any real value.

96.     There are a finite number of legitimate works by Calder. Removal of legitimate Calder works from the market results in an artificially increased value to those works that are recognized as authentic works by Calder. By limiting the supply of Calder works on the market, the defendants have artificially increased the value of the works that they own. Through these unscrupulous actions they have restrained trade and monopolized trade in the relevant market of Calder works.

**Fraudulent And Secretive Activity**

97.     Defendants engaged in a successful, illegal conspiracy to restrain trade in the sale of authentic Calder artworks, and to restrain competition in the Calder market by controlling authentication procedures of Calder artworks in a manner which, by its very nature, was inherently self-concealing.

98.     Due to the fraudulent and secretive nature of defendants conduct, it is expected that additional relevant facts will come to light during the discovery process.

99.    The fraudulent and secretive nature of defendants' conduct, despite its monumental impact on the segment of the public involved in the submarket for Calder's works, is exemplified by its refusal to provide plaintiff with a straightforward response to its request for an inventory number for *Eight Black Leaves*.  Mr. Rower's cryptic October 22, 2012 letter acknowledged that the Work was created by Calder and that it was legitimately purchased by Gérald Cramer.  It also admitted that the work was "documented at the Foundation."  However, Rower did not commit to providing an inventory number and asserted -- incorrectly – that the Work was a fragment of a larger work.  Plaintiff's counsel's August 7, 2013 letter to Rower and the Foundation requesting issuance of an inventory number has not been answered to date. Because an inventory number is required to sell a Calder work, the Foundation's silence in response to requests for issuance of an inventor number is tantamount to a rejection.  It has restrained plaintiff from selling its authentic Calder work.

100.    Defendants have also fraudulently and deceptively attempted to manipulate the purported scope of its actions to cover-up its conspiracy.  A Foundation and an Authentication Board with overlapping members is inherently questionable and problematic.  The Foundation's solution is to act as both Foundation and Authentication Board, without actually creating an Authentication Board.  That the Foundation serves as a *de facto* Authentication Board does not minimize the impact of the conspiracy.

101.    In response to a 2007 lawsuit exposing the Foundation's illegal practices, and other legal developments limiting an art foundations ability to manipulate the market, the Foundation attempted to change the scope of its activities to insulate itself from responsibility for its fraudulent and illegal conduct.

*See:*

www.abajournal.com/mobile/article/litigation_fears_could_lead_to_increased_artistic_fakery/

However, those changes were all form and no substance. The Foundation still controls the authentication of Calder works, and Calder works cannot be sold on the market without issuance of an inventory number from the Foundation. It still makes its decisions based on a desire to maximize the value of the Foundation's holdings, consisting of Calder's art works with a fair market value of $335,757,798 as of the filing of the Foundations 2011 tax returns. The Foundation's assertions that it now registers rather than authenticates, and that it has abandoned efforts to create a catalogue raisonné, are of no moment when compared to the Foundation's arbitrary and prejudicial exertion of its power over the marketplace. Indeed, the purported charitable purpose of the Foundation is "cataloguing all of the works produced by the artist Alexander Calder and making his works available for public inspection in order to facilitate art education and research." The fact that there is no catalogue raisonné online is not a license for the Foundation to exercise its duties and responsibilities in a manner which violates antitrust laws.

102.    The Foundation is required to file a Registration Statement with the New York Attorney General's office, as are all not-for-profit entities registered in New York. However, a FOIL request made to the New York Attorney General's office in July, 2013, revealed that the Foundation's Registration Statement is not currently on file with the Attorney General's Office. The Foundation is acting under a veil of secrecy.

103.    The Foundation's standards and guidelines for evaluating works and providing inventory numbers are also secretive and unknown to the public. The composition of persons involved in these decisions is unknown, with the exception of Mr. Rower who appears to exert

absolute control over the Foundation's authentication decisions. Other than being the grandson of Alexander Calder, there is no indication that Mr. Rower is qualified to make such important decisions. His position at the Foundation and its ownership of hundreds of millions of dollars of Calder art certainly compromises the integrity of his decision-making process. Conflict-of-interest aside, from an objective basis it appears that Mr. Rower lacks the sufficient expertise and knowledge to be entrusted with authentication decisions that impact the entire Calder submarket.

104.    The Foundation is not composed of qualified and independent persons making important decisions on authentication. On its website, it solicits unknown owners of Calder works to submit their works for examination and potential registration and seeks to compel potential registrants to sign one-sided agreements stating that the potential registrants: "...understand that the Calder Foundation registers works at its sole discretion and that the submission of this Application does not guarantee the registration of the submitted work and further does not in any way create a contract between the Foundation and me, the Owner, for the purpose of authentication or other related matters."

105.    Market participants with hundreds of millions of dollars worth of holdings should not be permitted to have "sole discretion" to control authentication decisions which impact the market, restrain trade and result in monopoly. The Foundation and its co-conspirators, Rower and John Does 1-20, have exercised such sole discretion and they have done so in a way that violates §§ 1 and 2 of the Sherman Act and the New York Donnelly Act.

## Summary of Section 2 Violations—Monopolizing The Relevant Market

106.    The allegations set forth above indicate defendants' violation of §§ 1 and 2 of the Sherman Act and the New York Donnelly Act.

107.    The relevant market is defined above, relating to the offering and sale of Calder works in New York, the United States generally, and anywhere else in the world that Calder works are bought and sold.

108.    Defendants possess the power to arbitrarily exclude the offering and sale of Calder works from said market.  All of the Calder works offered for sale anywhere in the world, whether privately or by auction, must be given an inventory number issued by the Calder Foundation before any sale can take place.  Thus, as for any specific Calder work, defendants have total domination of the market to prohibit said work from being offered and sold.

109.    The reason for defendants' overt activities as alleged was to restrain competition unreasonably, to maintain their unlawful market domination, and, alternatively, to monopolize the market for buying and selling Calder works.  Defendants are able to leverage their existing total control over the authentication process into monopoly power in the market for buying and selling Calder works.

110.    Defendants' actions affect many tens of millions of dollars in interstate commerce and transactions.  The power to exclude persons from the relevant market has been, and continues to be, exercised by defendants through their combination and conspiracy.

111.    In addition to violating § 1 of the Sherman Act and the New York Donnelly Act, defendants' activities constitute a violation of § 2 of the Sherman Act., 15 U.S.C. § 2 and the New York Donnelly Act, § 340 of the New York General Business Law.

112.    By reason of these activities by defendants, plaintiff has been unable to sell *Eight Black Leaves* in the relevant market and has suffered damages in an amount to be proven at trial but which is in no event less than  $1,200,000 (One Million Two Hundred Thousand Dollars), plus interest.  Pursuant to 15 U.S.C. § 15(a), plaintiff is entitled to treble damages which are to

be determined at trial but which are in no event less than $3,600,000.00 (Three Million Six Hundred Thousand Dollars).

113.   In the event that the Court or a jury is unable to determine the amount of compensatory damages due to plaintiff, plaintiff shall be entitled to the alternative relief of a mandatory injunction compelling defendants to issue an inventory number to plaintiff for the Work and a judgment declaring that the Work is an authentic creation of Alexander Calder and that it may be deemed to be sold as such.

114.   Plaintiff is further entitled to punitive damages because of defendants' willful and malicious actions.

## COUNT FOUR
### (Tortious Interference With Prospective Business Relations Against All Defendants)

115.   Plaintiff repeats and realleges each and every allegation set forth in Paragraphs 1-114 above and incorporates the same by reference as if fully set forth herein.

116.   Defendants were aware of Plaintiff's interest in selling *Eight Black Leaves* as evidenced by Plaintiff's requests for issuance of an inventory number for *Eight Black Leaves* as well as Christie's inquiries regarding *Eight Black Leaves* made to the Foundation on behalf of Plaintiff.

117.   In fact, Plaintiff had a pre-existing business relationship with Christie's which had previously been engaged to auction other works of art owned by Plaintiff.  Christie's was interested in auctioning *Eight Black Leave* on behalf of the Plaintiff and Christie's would have done so, but for the Foundation's refusal to issue an inventory number.

118.   Christie's estimated that the Work would sell for $1,200,000 at auction. Defendants knew that Christie's inquiries to the Foundation concerning *Eight Black Leaves* were made because Christie's was interested in auctioning the Work on behalf of Plaintiff.

Defendants also knew that Christie's would auction the work on behalf of Plaintiff if they issued an inventory number for the Work – and that Christie's would not auction the Work if Defendants refused to issue an inventory number as requested.

119.    Defendants' refusal to issue an inventory number for *Eight Black Leaves* was a malicious and independently tortuous act designed solely to interfere with and destroy Plaintiff's prospective business relationship with Christie's and to destroy the potential for any alternative business relationships either with auction houses or prospective buyers of the Work.

120.    At minimum, Defendants acted with culpable recklessness or gross negligence by refusing to issue an inventory number and refusing to consider the evidence and information supplied by Plaintiff to Defendants which confirmed the authenticity of the Work.

121.    As a result of Defendants' improper actions, Plaintiff has suffered and continues to suffer damages as a result of the lost sale of the Work to interested third parties, either through Christie's or through a direct sale of the Work.

122.    By reason of the foregoing, Plaintiff is entitled to compensatory damages in an amount to be determined at trial but which is in no event less than $1,200,000, plus interest.

123.    Plaintiff is further entitled to punitive damages in an amount to be determined at trial because of the willful, wanton, malicious and intentional nature of the Defendants' conduct.

## COUNT FIVE
### (Breach of Contract Against the Estate of Alexander Calder)

124.    Plaintiff repeats and realleges each and every allegation set forth in Paragraphs 1-123 above and incorporates the same by reference as if fully set forth herein.

125.    In 1948 Alexander Calder entered into an agreement with Gérald Cramer whereby Calder agreed to sell *Eight Black Leaves* to Gérald Cramer.

126. The sale was consummated in 1948 and Gérald Cramer purchased *Eight Black Leaves* from Calder.

127. The agreement required Calder to sell to Gérald Cramer sui generis work of art which could be sold or displayed in Gérald Cramer's art gallery.

128. In 1950, Gérald Cramer gave to Alexander Calder a copy of Cramer Gallery Catalogue no. 6, 1950 which contained a photograph and description of *Eight Black Leaves*. See, Exhibit B.

129. Calder never voiced any objection to the inclusion of *Eight Black Leaves* in the Cramer Gallery Catalogue, never questioned its authenticity, never informed Gérald Cramer that *Eight Black Leaves* was not a stand-alone piece of art, never claimed that it was a fragment of a larger work and never questioned Gérald Cramer's rights as the owner of the Work.

130. Having full knowledge of Gérald Cramer's possession and ownership of *Eight Black Leaves*, Calder maintained a lifelong friendship and friendly correspondence with Gérald Cramer of approximately 40 letters and postcards, which would have been inconceivable had Gérald Cramer wrongfully possessed and displayed *Eight Black Leaves*, the work he purchased from Calder.

131. Despite Calder's acknowledgement of the authenticity of *Eight Black Leaves* during his lifetime, the Foundation now refuses to assign an inventory number for the Work and claims that it is not a complete work of art but merely a fragment of a larger work.

132. Plaintiff asserts that *Eight Black Leaves* is not a fragment of a larger work and seeks a declaratory judgment as to its authenticity. However, if there is a determination that *Eight Black Leaves* is a fragment of a larger work then Calder breached his agreement with Gérald Cramer which called for the sale of a sui generis work of art.

133.    In such event, the statute of limitations must be tolled as a result of Calder's subsequent confirmation of the authenticity of the Work and his concealment his failure to perform under his agreement with Gérald Cramer by delivering a complete and authentic work of art.

134.    Plaintiff has been damaged by such breach and is entitled to compensatory damages in an amount to be determined at trial but which is in no event less than $1,200,000, plus interest.  EAC is liable and responsible for Calder's breach of contract.

## COUNT SIX
### (Fraudulent Inducement Against the Estate of Alexander Calder)

135.    Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1-134 above and incorporates the same by reference as if fully set forth herein.

136.    When Calder sold *Eight Black Leaves* to Gérald Cramer in 1948, he represented it to be a sui generis work of art.

137.    Plaintiff asserts that *Eight Black Leaves* is not a fragment of a larger work and seeks a declaratory judgment as to its authenticity.  However, if there is a determination that *Eight Black Leaves* is a fragment of a larger work then Calder induced Gérald Cramer to enter into the agreement to purchase *Eight Black Leaves* by falsely representing that it was a sui generis work.

138.    As the creator of the Work, Calder would have known whether it was authentic and whether it was intended to be a sui generis work or a fragment of a larger work. Accordingly, if it is determined to be inauthentic or a fragment of a larger Work then Calder's false representations were intentional and Calder knew that they were false when they were made.

139.    Calder's statements representing *Eight Black Leaves* to be an authentic sui generis work of art were made with the intent to induce Gérald Cramer to enter into the agreement to buy the Work and such statements did, in fact, induce Gérald Cramer to enter into the agreement.

140.    After representing *Eight Black Leaves* to be an authentic and complete work of art, and after the Work was sold to Gérald Cramer, in 1950 Gérald Cramer gave to Alexander Calder a copy of Cramer Gallery Catalogue no. 6, 1950) which contained a photograph and description of *Eight Black Leaves*.  See, Exhibit B.

141.    Calder never voiced any objection to the inclusion of *Eight Black Leaves* in the Cramer Gallery Catalogue, he never questioned its authenticity, never informed Gérald Cramer that *Eight Black Leaves* was not a stand-alone piece of art, never claimed that it was a fragment of a larger work and never questioned Gérald Cramer's rights as the owner of the Work.

142.    Having full knowledge of Gérald Cramer's possession and ownership of *Eight Black Leaves*, Calder maintained a lifelong friendship and friendly correspondence with Gérald Cramer of approximately 40 letters and postcards, which would have been inconceivable had Gérald Cramer wrongfully possessed and displayed *Eight Black Leaves*, the work he purchased from Calder.

143.    If, in fact, *Eight Black Leaves* was not a complete work of art, but a fragment of a larger work, then Calder fraudulently concealed that fact from Gérald Cramer prior to the sale of the Work and after the sale of the Work.

144.    The fraud was concealed and could not be discovered, and the statute of limitations was tolled, through on or about October 7, 2013, when it became clear that the

Foundation would not respond to Plaintiff's counsel's letter requesting issuance of an inventory number.

145.     As a result of the fraudulent misrepresentation and the subsequent fraudulent concealment, Plaintiff has suffered compensatory damages in an amount to be determined at trial but which is in no event less than $1,200,000, plus interest.  EAC is liable and responsible for Calder's fraud.

146.     Plaintiff is further entitled to punitive damages in an amount to be determined at trial as a result of the tortuous and fraudulent conduct for which the EAC is liable and responsible.

## **RELIEF REQUESTED**

WHEREFORE, plaintiff demands relief as follows:

a.  On plaintiff's first cause of action a declaratory judgment holding that the *Eight Black Leaves* is an authentic work by Alexander Calder and a mandatory injunction compelling defendants to issue an inventory number to plaintiff for the Work;

b.  On plaintiff's second cause of action a judgment awarding compensatory damages in an amount to be determined at trial but which in no event is less than  $1,200,000 (One Million Two Hundred Thousand Dollars), plus interest and a judgment awarding punitive damages to plaintiff in an amount sufficient to punish defendants for their conduct and to set an example to deter others from similar conduct;

c.   On plaintiff's third cause of action  a judgment decreeing that each of the defendants violated Section 1 of the  Sherman Act and the New York Donnelly Act by unlawfully attempting and conspiring to restrain trade; a judgment decreeing that each of the defendants violated Section 2 of the Sherman Act and the New York

Donnelly Act by unlawfully attempting and conspiring to monopolize, and actually monopolizing, the relevant markets; a judgment awarding compensatory damages to plaintiff in amount to be trebled pursuant to 15 U.S.C. § 15(a)  which are to be determined at trial but which are no event less than $3,600,000 (Three Million Six Hundred Thousand Dollars), plus interest and a judgment awarding punitive damages to plaintiff in an amount sufficient to punish defendants for their conduct and to set an example as to deter others from similar conduct.

d.  On plaintiff's third cause of action, in the event that the Court cannot determine the amount of compensatory damages due to plaintiff, plaintiff seeks the alternative relief of a mandatory injunction compelling defendants to issue an inventory number to plaintiff for the Work;

e.  On plaintiff's fourth cause of action a judgment awarding compensatory damages in an amount to be determined at trial but which in no event is less than  $1,200,000 (One Million Two Hundred Thousand Dollars), plus interest and a judgment awarding punitive damages to plaintiff in an amount sufficient to punish defendants for their conduct and to set an example to deter others from similar conduct;

f.  On plaintiff's fifth cause of action a judgment awarding compensatory damages in an amount to be determined at trial but which in no event is less than  $1,200,000 (One Million Two Hundred Thousand Dollars), plus interest;

g.  On plaintiff's sixth cause of action a judgment awarding compensatory damages in an amount to be determined at trial but which in no event is less than  $1,200,000 (One Million Two Hundred Thousand Dollars), plus interest and a judgment awarding

punitive damages to plaintiff in an amount sufficient to punish defendants for their conduct and to set an example to deter others from similar conduct;

h.   Plaintiff's costs and disbursements incurred litigating this action, including reasonable legal fees, together with such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, plaintiff demands a trial by jury in this action of all issues so triable.

Dated:   New York, New York
         February 28, 2014

                              EATON & VAN WINKLE LLP

                    By:       _____
                              Michael A. Lacher. (ML8229)
                              Adam J. Rader (AR3530)
                              3 Park Avenue
                              New York, NY 10016
                              212-779-9910